FILED

2014 DEC -3 PM 2:24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>JEREMY NELSON,<br>　aka "Jeremy Jackson,"<br>ELIAS PONCE,<br>　and<br>JOHN VARTANIAN,<br><br>　　　　Defendants. | No. SACR14-00198<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Mail Fraud and Wire Fraud; 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 2: Aiding and Abetting an Act to be Done] |

The Grand Jury Charges:

INTRODUCTORY ALLEGATIONS

At various times relevant to this Indictment:

1.   Defendants JEREMY NELSON, also known as ("aka") "Jeremy Jackson" ("defendant NELSON"), ELIAS PONCE ("defendant PONCE"), and JOHN VARTANIAN ("defendant VARTANIAN") and their co-conspirators managed and worked for a series of fraudulent companies (the "Debt Relief Companies") in the Central District of California that purportedly provided debt relief services to clients nationwide. The defendants portrayed the Debt Relief Companies as law firms and attorney-based companies that would negotiate favorable debt

1

settlements with creditors on behalf of clients. Clients made monthly payments to the Debt Relief Companies expecting the money would go toward settlements, but the defendants and their co-conspirators instead took the first six months of payments as undisclosed up-front fees.

2. The defendants and their co-conspirators originally operated under the name Nelson Gamble & Associates LLC ("Nelson Gamble"), then switched to Jackson Hunter Morris & Knight LLP ("Jackson Hunter").

3. Defendant NELSON was the owner, operator, and manager of Nelson Gamble and Jackson Hunter.

4. Defendant PONCE was a manager for Nelson Gamble and Jackson Hunter.

5. Defendant VARTANIAN was a sales representative for Nelson Gamble and Jackson Hunter.

6. Nelson Gamble was a Colorado corporation with its principal place of business at 30221 Aventura, Second Floor, Rancho Santa Margarita, California. Nelson Gamble operated from in or around February 2010 until in or around September 2011.

7. Jackson Hunter was a Nevada corporation with its principal place of business at 30221 Aventura, Second Floor, Rancho Santa Margarita, California, from in or around September 2011 to in or around March 2012, and 8001 Irvine Center Drive, Suite 940, Irvine, California, from in or around March 2012 to in or around September 2012.

## COUNT ONE

[18 U.S.C. § 1349]

8. The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 7 of this Indictment as though fully set forth herein.

A. THE OBJECTS OF THE CONSPIRACY

9. From in or around February 2010 through in or around September 2012, in Orange County, within the Central District of California, and elsewhere, defendants NELSON, PONCE, and VARTANIAN did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

    a. To knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and for the purpose of executing and attempting to execute the scheme and artifice, to knowingly cause to be delivered certain mail matter by the United States Postal Service and by private and commercial interstate carriers, according to the directions thereon, in violation of Title 18, United States Code, Section 1341;

    b. To knowingly and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that

3

they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

10. It was the purpose of the conspiracy for the defendants and their co-conspirators to defraud consumers by: (a) soliciting consumers who owed high amounts of unsecured credit card and other debt; (b) offering to settle the consumers' debts for 50 percent or less of the original debt amount; (c) making false and fraudulent representations about the nature and professional experience of the Debt Relief Companies; (d) making false and fraudulent representations and failing to disclose material facts about the fees consumers paid for the debt relief service; and (e) failing to settle most client debts, and instead diverting the fraudulently obtained proceeds for their personal use and benefit and to further the fraudulent scheme.

B. MANNER AND MEANS OF THE CONSPIRACY

11. The objects of the conspiracy were to be accomplished in substance as follows:

    a. The Debt Relief Companies advertised their services on the Internet and through telemarketing campaigns. Websites at nelsongamble.com, jhmklaw.com, and jhmklaw.org touted the companies' experience and ability to negotiate debts down by at least 50 percent. The Nelson Gamble website claimed the company used a "team of legal professionals" to assist clients, that the company had settled more than $800 million in debts, and that the company

charged "NO up-front fees." The Jackson Hunter website stated that the company's "attorneys" had been featured on FOX News, CBS, ABC, MSNBC, NBC, ESPN, and FOX.

      b.    Potential clients who responded to the advertisements spoke to sales representatives, including, at times, defendant VARTANIAN. VARTANIAN and other sales representatives told potential clients that Nelson Gamble and Jackson Hunter would negotiate debt settlements with clients' creditors. VARTANIAN and other sales representatives said clients would make monthly payments to escrow accounts that would be used to pay the settlements. At times during the conspiracy, sales representatives, including VARTANIAN, led prospective clients to believe that Nelson Gamble and Jackson Hunter were law firms and worked with attorneys, and that the only up-front fee for the companies' services was an "enrollment fee" of approximately $200. Unbeknownst to these clients, the companies did not employ attorneys and charged fees equal to at least 15 percent of the debt clients enrolled in the program, with a large portion of those fees paid up front. For example, a client with $10,000 in debt would be charged at least $1,500 in "setup" fees, along with additional monthly fees. At times, customers who specifically asked were told about a 15 percent fee, but the defendants and their co-conspirators did not disclose that in most cases the first six monthly payments would go almost entirely toward up-front fees.

      c.    Clients who enrolled in the program received a "Welcome Call," during which clients verified bank information and verbally approved monthly payments to be drafted from their personal bank accounts. Defendant PONCE and others in the "client relations"

department usually made the welcome calls. As with sales calls, clients generally were not told about up-front fees during welcome calls.

        d.    Defendant NELSON arranged for special purpose accounts with COMPANY 1, a third-party payment processor, to hold client payments in escrow. NELSON caused applications for client accounts at COMPANY 1 to be signed in clients' names with digital signatures. Most clients were not aware their names would be electronically signed on the account applications and did not authorize the digital signatures.

        e.    Each month, clients' monthly payments were electronically drafted from clients' personal bank accounts and deposited into the escrow accounts maintained by COMPANY 1. During the first six months of a client's enrollment, NELSON caused to be debited from the client's escrow account fees nearly equal to the client's entire monthly payment.

        f.    Clients who discovered the balances in their escrow accounts were much lower than expected frequently called the Debt Relief Companies to inquire about their money. Defendant PONCE often handled such calls, and reassured clients that their money was still available even though it did not appear on account statements. In some cases, PONCE told clients that the money was transferred to hide it from creditors.

        g.    Clients frequently contacted the Debt Relief Companies to complain about the lack of progress in negotiating settlements. Defendant PONCE, his co-conspirators, and other client relations employees told clients that the companies were working

6

with creditors. In fact, company representatives rarely attempted negotiations during the first six months of a client's enrollment because the client's money was diverted to fees and no money was available for settlements. During that time, creditors sometimes took the companies' clients to court, attempted to garnish clients' wages, added interest fees and other charges on top of the clients' debts, and reported delinquencies to the clients' credit bureaus.

   h. If a client asked to cancel the program and receive a refund, defendant PONCE and others in the "client relations" department said the request would be forwarded to a "review board" for 60 to 90 days. The "review board" consisted solely of defendant NELSON. Clients who contacted the Debt Relief Companies again following the review period were told that the "review board" had denied the refund requests.

   i. In or around September 2011, in response to client complaints and refund requests, defendant NELSON changed the name of the operation from Nelson Gamble to Jackson Hunter. NELSON directed his co-conspirators and employees to tell clients that Nelson Gamble had gone bankrupt, and that Jackson Hunter was an unrelated company that had purchased the right to service some of Nelson Gamble's clients. Defendants NELSON and PONCE caused clients inquiring about low escrow account balances to be told that Nelson Gamble had charged its clients up-front fees, and that Jackson Hunter could not refund money paid to a different company. Defendants NELSON, PONCE, and their co-conspirators assured clients that Jackson Hunter was a more experienced and better-run company that would settle clients' debts as promised. Some clients continued to make payments to the

"new" company. Other clients who previously demanded refunds accepted the explanation that Nelson Gamble was bankrupt and did not pursue complaints against Jackson Hunter.

12.  To fraudulently induce consumers to enroll in the debt relief services program, defendants NELSON, PONCE, VARTANIAN, and their co-conspirators provided and made, and caused others to provide and make, materially false statements, and omitted and concealed, and caused others to omit and conceal, material facts, including, among other things, the following:

### Materially False Statements

a.  That Nelson Gamble and Jackson Hunter were law firms and had attorneys working on their behalf;

b.  That Nelson Gamble and Jackson Hunter charged no up-front fees other than an enrollment fee of approximately $200;

c.  That Nelson Gamble had settled more than $90 million of debt in the past 12 months and more than $800 million since the company's inception, and that Jackson Hunter had more than $1 billion of debt under management;

d.  That Jackson Hunter's attorneys had been featured on Fox News, CBS, ABC, MSNBC, NBC, ESPN, and Fox;

e.  That Nelson Gamble employed "certified" debt negotiators and Jackson Hunter employed expert account negotiators who formulated customized programs to eliminate clients' debts;

f.  That Jackson Hunter settled debts for clients prior to its incorporation in September 2011; and

g.  That Nelson Gamble had gone bankrupt, and that Jackson Hunter was an unrelated, separate entity which had purchased Nelson Gamble's client files;

Omission/Concealment of Material Facts

h.  That the first six months of payments made to Nelson Gamble and Jackson Hunter went toward up-front fees and not toward settlements with creditors;

i.  That defendant NELSON owned and operated both Nelson Gamble and Jackson Hunter; and

j.  That the Debt Relief Companies received many complaints from existing clients regarding the lack of progress in negotiating debts and low balances in client escrow accounts.

C.  OVERT ACTS

13.  In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants NELSON, PONCE, VARTANIAN, and their co-conspirators committed and caused to be committed, within the Central District of California, at least one of the following overt acts, among others:

OVERT ACT 1:  On or about August 15, 2010, defendant VARTANIAN emailed a "client plan" for victim M.C. to defendant NELSON.  The client plan listed a "debt load" of $70,950 and a fee of $13,000.20.  The client plan further detailed that during the first six months of client payments, $4,926.70 would go to fees and $0.30 would go to "savings."  Defendant VARTANIAN was listed as the sales representative for M.C. on the client plan.

OVERT ACT 2:  On or about August 17, 2010, defendant VARTANIAN emailed a "client plan" for victim C.S.1 to defendant NELSON.  The

9

client plan listed a "debt load" of $41,500 and a fee of $8,821.60. The client plan further detailed that during the first six months of client payments, $2,274.70 would go to fees and $0.30 would go to "savings." Defendant VARTANIAN was listed as the sales representative for C.S.1 on the client plan.

OVERT ACT 3:  On or about September 22, 2010, defendant VARTANIAN emailed a "client plan" for victim N.B. to defendant NELSON. The client plan listed a "debt load" of $34,781 and a fee of $8,170.10. The client plan further detailed that out of the first six months of client payments, $2,011.10 would go to fees and $0.90 would go to "savings." Defendant VARTANIAN was listed as the sales representative for N.B. on the client plan.

OVERT ACT 4:  On or about November 16, 2010, defendant VARTANIAN emailed a "client plan" for victim J.P. to defendant NELSON. The client plan listed a "debt load" of $32,169 and a fee of $7,419. The client plan further detailed that during the first six months of client payments, $2,491.10 would go to fees and $0.90 would go to "savings." Defendant VARTANIAN was listed as the sales representative for J.P. on the client plan.

OVERT ACT 5:  On or about July 7, 2011, defendant VARTANIAN emailed a "client plan" for victim M.T. to defendants NELSON and PONCE. The client plan listed a "debt load" of $28,000 and a fee of $6,792.80. The client plan further detailed that during the first six months of client payments, $1,897.10 would go to fees and $0.90 would go to "savings." Defendant VARTANIAN was listed as the sales representative for M.T. on the client plan.

OVERT ACT 6: On or about September 27, 2011, defendant NELSON e-mailed COMPANY 1 an application package for Jackson Hunter to use COMPANY 1 as its third-party payment processor. Attached to the e-mail was a copy of the California Driver's License of J.L., the purported president of Jackson Hunter.

OVERT ACT 7: On or about October 3, 2011, defendant PONCE sent an email to Nelson Gamble employees stating that "[w]e are no longer Nelson Gamble & Associates, as of today we have been acquired by Jackson Hunter Morris & Knight LLP."

OVERT ACT 8: On or about October 3, 2011, defendant NELSON sent an email to COMPANY 2, a third-party payment processor, stating that his company's fees "are broken down and paid over the duration of the program," that all clients meet face-to-face with "attorneys or qualified paralegals, where applicable," and that the company offered "a full array of legal services, from [b]ankruptcy, to divorce, to minor criminal defense, etc."

OVERT ACT 9: On or about October 21, 2011, defendant PONCE spoke to victim F.Z. on the phone and told her Jackson Hunter was a law firm and had been in business for 75 years. Defendant PONCE also told F.Z. that he was not the person F.Z. remembered from Nelson Gamble, and that his name was actually Elias Vargas.

OVERT ACT 10: On or about October 25, 2011, defendant PONCE spoke to victim A.W. on the phone and told her Jackson Hunter has been around for more than 75 years in management and finance. Defendant PONCE also told A.W. that the partners at Jackson Hunter

allowed only a small number of Nelson Gamble employees to keep their jobs.

OVERT ACT 11: On or about October 26, 2011, defendant VARTANIAN emailed a "client plan" for victim C.S.2 to Jackson Hunter. The client plan listed a "debt load" of $53,990 and a fee of $9,573.70. The client plan further detailed that out of the first six months of client payments, $5,174.48 would go to fees and $0.00 would go to "savings." Defendant VARTANIAN was listed as the sales representative for C.S.2 on the client plan.

OVERT ACT 12: On or about October 28, 2011, defendant PONCE emailed defendant NELSON and another co-conspirator a "transition script" to be communicated to clients, stating:

> As you may have already heard, Nelson Gamble & Associates has filed for bankruptcy protection. [Jackson Hunter] took over a portion of their files based on whether or not the program set up met our specific guidelines and regulations. Fortunately for you, we have approved your file and have taken on your case.

OVERT ACT 13: On or about February 29, 2012, defendant VARTANIAN emailed client M.A. and stated "[Jackson Hunter] has the legal experience and the network to protect you legally against creditors, lenders, and banks. Our legal expertise and integrity will allow us to become one of the most trusted firms in the country."

OVERT ACT 14: On or about March 1, 2012, defendant VARTANIAN emailed a "payment plan" for victim M.A. to Jackson Hunter. The

payment plan listed setup, retainer, and maintenance fees totaling $3,120.80 and a total "program cost" of $7,212.40.

OVERT ACT 15: On or about March 20, 2012, defendant NELSON spoke to victim B.A. on the phone and told her that Nelson Gamble "got most of the money" and left Jackson Hunter "to deal with all of the mess."

OVERT ACT 16: On or about May 11, 2012, while on a phone call with victim J.C., defendant PONCE purported to call Nelson Gamble on behalf of victim J.C. Defendant PONCE told J.C. that he could not reach Nelson Gamble, but the attorneys at Jackson Hunter were attempting to obtain money from Nelson Gamble for customer refunds.

OVERT ACT 17: In or around September 2012, Jackson Hunter employees were told that, going forward, the company would be known as BlackRock Professional Corporation.

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1341, 2]

14.   The Grand Jury hereby repeats, re-alleges, and incorporates herein by reference paragraphs 1-7 of this Indictment as though fully set forth herein.

A.   THE FRAUDULENT SCHEME

15.   From in or around February 2010 through in or around September 2012, in Orange County, within the Central District of California, and elsewhere, defendants NELSON, PONCE, and VARTANIAN, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud as to material matters and to obtain money from clients of the Debt Relief Companies by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made.

B.   MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

16.   The Grand Jury hereby repeats, re-alleges, and incorporates herein by reference paragraphs 11-12 of this Indictment as though fully set forth herein.

C.   USE OF THE MAILS

17.   On or about the following dates, within the Central District of California, and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud, the following defendants, together with others known and unknown to the Grand Jury, aiding and abetting each other, did deposit and cause to be deposited matter to be sent and delivered by the United States Postal Service, according to the directions thereon:

14

| COUNT | DATE | DESCRIPTION OF MAILING | DEFENDANTS |
|---|---|---|---|
| TWO | 8/23/2010 | Welcome Packet sent from the Central District of California via U.S. Mail to victim C.S.1 in Wisconsin | JEREMY NELSON JOHN VARTANIAN |
| THREE | 11/9/2010 | Welcome Packet sent from the Central District of California via U.S. Mail to victim L.J. in Ohio | JEREMY NELSON |
| FOUR | 11/10/2011 | Welcome Packet sent from the Central District of California via U.S. Mail to victim C.S.2 in New Jersey | JEREMY NELSON ELIAS PONCE JOHN VARTANIAN |
| FIVE | 3/20/2012 | Welcome Packet sent from the Central District of California via U.S. Mail to victim M.A. in North Carolina | JEREMY NELSON ELIAS PONCE JOHN VARTANIAN |

COUNTS SIX THROUGH TWENTY-THREE

[18 U.S.C. §§ 1343, 2]

18.  The Grand Jury hereby repeats, re-alleges, and incorporates herein by reference paragraphs 1-7 of this Indictment as though fully set forth herein.

A.   THE FRAUDULENT SCHEME

19.  From in or around February 2010 through in or around September 2012, in Orange County, within the Central District of California, and elsewhere, defendants NELSON, PONCE, and VARTANIAN, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud as to material matters and to obtain money from clients of the Debt Relief Companies by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made.

B.   MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

20.  The Grand Jury hereby repeats, re-alleges, and incorporates herein by reference paragraphs 11-12 of this Indictment as though fully set forth herein.

C.   THE USE OF THE WIRES

21.  On or about the following dates, within the Central District of California, and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud, the following defendants, together with others known and unknown to the Grand Jury, aiding and abetting each other, transmitted and caused

the transmission of the following items by means of wire and radio communication in interstate commerce:

| COUNT | DATE | DESCRIPTION OF WIRE | DEFENDANT(s) |
|---|---|---|---|
| SIX | 6/15/2010 | Electronic transmission of Special Purpose Account Application for victim M.L. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON |
| SEVEN | 8/16/2010 | Electronic transmission of Special Purpose Account Application for victim M.C. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON JOHN VARTANIAN |
| EIGHT | 8/17/2010 | Electronic transmission of Special Purpose Account Application for victim C.S.1 from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON JOHN VARTANIAN |
| NINE | 9/22/2010 | Electronic transmission of Special Purpose Account Application for victim N.B. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON JOHN VARTANIAN |
| TEN | 11/1/2010 | Electronic transmission of Special Purpose Account Application for victim D.S. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON |

| | | | |
|---|---|---|---|
| ELEVEN | 11/8/2010 | Electronic transmission of Special Purpose Account Application for victim L.J. from Nelson Gamble in the District of California to COMPANY 1 in Oklahoma | JEREMY NELSON |
| TWELVE | 11/17/2010 | Electronic transmission of Special Purpose Account Application for victim J.P. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON JOHN VARTANIAN |
| THIRTEEN | 11/29/2010 | Electronic transmission of Special Purpose Account Application for victim M.H. from Nelson Gamble in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON JOHN VARTANIAN |
| FOURTEEN | 1/26/2011 | Phone call between ELIAS PONCE in the Central District of California and victim L.J. in Ohio | JEREMY NELSON ELIAS PONCE |
| FIFTEEN | 7/12/2011 | Phone call between ELIAS PONCE in the Central District of California and victim M.T. in Vermont | JEREMY NELSON ELIAS PONCE JOHN VARTANIAN |
| SIXTEEN | 10/6/2011 | Electronic transmission of Dedicated Account Agreement and Application for victim S.H. from Jackson Hunter in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON ELIAS PONCE |

| | | | |
|---|---|---|---|
| SEVENTEEN | 10/28/2011 | Electronic transmission of Dedicated Account Agreement and Application for victim C.S.2 from Jackson Hunter in the Central District of California to COMPANY 1 in Oklahoma | JEREMY NELSON ELIAS PONCE JOHN VARTANIAN |
| EIGHTEEN | 12/13/2011 | E-mail communication from a co-conspirator in the Central District of California to COMPANY 1 in Oklahoma regarding victim M.L. | JEREMY NELSON ELIAS PONCE |
| NINETEEN | 1/17/2012 | E-mail communication from ELIAS PONCE in the Central District of California to victim S.H. in New York | JEREMY NELSON ELIAS PONCE |
| TWENTY | 2/6/2012 | Phone call between JEREMY NELSON in the Central District of California and victim D.S. in Louisiana | JEREMY NELSON ELIAS PONCE |
| TWENTY-ONE | 3/9/2012 | Phone call between JEREMY NELSON in the Central District of California and victim M.C. in Nevada | JEREMY NELSON ELIAS PONCE JOHN VARTANIAN |
| TWENTY-TWO | 3/20/2012 | Phone call between ELIAS PONCE in the Central District of California and victim J.C. in Oregon | JEREMY NELSON ELIAS PONCE |

| TWENTY-THREE | 9/5/2012 | Facsimile transmission from Jackson Hunter in the Central District of California to the Oregon Department of Consumer and Business Services in Oregon regarding victim J.C. | JEREMY NELSON ELIAS PONCE |

A TRUE BILL

/S/
_____
Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

_[signature]_

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

DANIEL MICHAEL BAEZA
ALAN J. PHELPS
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch