EILEEN DECKER
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
ALAN J. PHELPS
JAMES W. HARLOW
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch
    450 Fifth St., NW, 6400-S
    Washington, DC 20001
    Telephone: (202) 307-6154
    Facsimile: (202) 514-8742
    Email: Alan.Phelps@usdoj.gov
          James.W.Harlow@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA 14-CR-00198-DSF-3 |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | Hearing Date: 11/21/16 |
| JOHN VARTANIAN, | Hearing Time: 8:30 a.m. |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, respectfully submits the following response to the Presentence Investigation Report ("PSR") and the government's position on sentencing in this matter. Sentencing is scheduled for November 21, 2016.

**I.**    **The Presentence Investigation Report**

The United States generally agrees with the findings and conclusions contained in the PSR. However, the United States objects to the finding that Vartanian should not receive a minor role

1

adjustment. PSR ¶ 63. Vartanian did not supervise any other employees and reported only to Jeremy Nelson. While Vartanian was the primary salesperson, he was not the only salesperson and generally did not work with other salespeople. Victims who spoke to Vartanian typically did so just once. Vartanian's role was limited to a relatively brief sales pitch in a single phone call. The evidence does not suggest that Vartanian typically handled complaints or dealt with victims after that initial call. Other defendants, such as Elias Ponce and Christopher Harati, worked to keep victims in the program month after month through multiple additional misrepresentations in repeated lulling phone calls. Ponce, Harati, and others heard from victims who spoke to other salespeople as well. They could see the scheme was bigger than Vartanian and his victims. While Vartanian obviously was aware of the lies he told victims, and knew exactly what those victims stood to lose if they believed those lies, he mainly worked on his own. Based on the facts of this particular case, a two-level reduction under U.S.S.G. § 3B1.2(b) is appropriate. Vartanian Plea Agreement ("Plea") ¶ 13(d).

The government has no other objections to the PSR.

**II.   The Defendant and the Scheme to Defraud**

On July 11, 2016, Vartanian pled guilty to Count 1 of the Indictment pursuant to a plea agreement. Vartanian was the last of five defendants to admit his role in the debt-relief scam known as Nelson Gamble. Vartanian's co-defendants in the indicted case, Jeremy Nelson and Elias Ponce, pled guilty in February 2016 and October 2015,

respectively. Two additional co-conspirators, Christopher Harati and Athena Maldonado, pled guilty to a related Information in June 2015. Vartanian's co-conspirators are set to be sentenced on November 14.

Vartanian worked as a salesman for Nelson's fraudulent companies, Nelson Gamble & Associates (NGA) and Jackson Hunter Morris & Knight (JHMK), from August 2010 to September 2012. PSR ¶ 28, 32; Plea at p. 7, 9. Based in an Orange County phone room, NGA/JHMK advertised consumer debt relief services nationwide. The companies claimed to negotiate debt settlements, typically involving credit card debts, at significant savings. PSR ¶ 17; Plea at p. 7. Vartanian, along with other employees and company websites led consumers to believe that the efforts of NGA and JHMK were backed by a law group or that the company worked with attorneys. PSR ¶ 14, 29; Plea at p. 8. In fact, no attorneys worked on behalf of the companies. Plea at p. 7.

Victims believed that their money would be kept in escrow accounts and used to pay the negotiated debt settlements. Salesmen such as Vartanian told customers that money paid to the escrow accounts would be refunded if customers were not satisfied. PSR ¶ 17; Plea at p. 8. Unbeknownst to most victims, NGA/JHMK withdrew from client escrow accounts up-front fees equal to fifteen percent of each customer's original total unsecured debt. PSR ¶ 18; Plea at p. 7-8. Vartanian and other employees did not tell potential customers about these significant up-front fees. PSR ¶ 29; Plea at p. 7-8. Instead, Vartanian referred customers to Nelson Gamble's misleading

website, which claimed the company charged "no up-front fees." PSR ¶ 29; Plea at 8.

Vartanian was well aware of the fees and what the victims he spoke with would actually pay. After closing each deal, Vartanian sent a "client plan" email to Nelson or others in the company to begin the process of enrolling the new customer in the program. PSR ¶ 30; Plea at p. 8; Attachment 1, Declaration of Raymond Campbell ("Campbell Decl.") ¶ 11. The client plan emails included a detailed breakdown of the fees each customer would pay. Id. As shown by those emails, the first six months of customer payments went directly to company fees. Plea at p. 8; Campbell Decl. ¶ 11. A large portion of later payments went to fees as well. Id. In pleading guilty, Vartanian agreed that his omission of the substantial fees was material and induced consumers to pay money into the debt relief program. Plea at p. 8.

In or around October 2011, mounting consumer complaints forced Nelson to change the name of the company from Nelson Gamble to Jackson Hunter. PSR ¶¶ 21-22; Plea at 8-9. The business operations remained the same. Plea at 8-9. Vartanian admitted that he knew Jackson Hunter was essentially the same company as Nelson Gamble, but he did not disclose this fact to customers. Plea at 9. Instead, he continued to make the same pitch containing the same misrepresentations and omissions. Id. For example, in one June 2012 call described in the Plea Agreement, Vartanian told a potential customer that Jackson Hunter was backed by a law group, that refunds would be available,

4

that Jackson Hunter's attorney trustee had $4 billion in debt settlement over nine years, and that the company had 89,000 clients. Plea at p. 9; PSR ¶ 31.  All of those statements were untrue.

Vartanian worked for Nelson until the very end.  He admitted that he continued to actively participate in the conspiracy until September 2012, when law enforcement closed the phone room.  Plea at 9; PSR ¶ 32.  During the approximately 30 months NGA/JHMK operated, roughly 2,000 consumers paid around $6.8 million to the escrow accounts.  PSR ¶ 26.  More than $4.5 million of that money went to the largely undisclosed fees, with only about $1.1 million paid to creditors.  PSR ¶¶ 26, 34.  Vartanian pitched at least 600 clients, as shown by his commission sheets.  PSR ¶ 28, Campbell Decl. ¶ 8. The victims Vartanian personally brought into the scheme paid more than $1.2 million in NGA/JHMK fees.  PSR ¶ 32; Campbell Decl. ¶ 8.

### III. Calculation of the Defendant's Sentence

The conduct charged in Count One of the Indictment continued into 2012.  Since that time, amendments have substantively changed the relevant guidelines.  The current Sentencing Guidelines should be used to calculate the defendant's sentence.  See U.S.S.G. § 1B1.11(a), App. Note 2.

#### A.   Base Offense Level

The defendant will be sentenced for conspiracy to commit mail and wire fraud. The Fraud/Theft Guideline (U.S.S.G. § 2B1.1) applies. See U.S.S.G. § 2X1.1.  The base offense level is seven.  See U.S.S.G. § 2B1.1(a)(1); Plea ¶ 13(a); PSR ¶ 55.

**B.   Fraud Loss Adjustment**

The fraud loss in this case includes the actual, intended, and reasonably foreseeable losses to the victims of the conspiracy in which Vartanian admitted he participated. See U.S.S.G. § 2B1.1, App. Note 3(A). Relevant conduct for sentencing purposes encompasses all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, as well as the jointly undertaken and reasonably foreseeable acts of the defendant's co-conspirators. See U.S.S.G. § 1B1.3(a); PSR ¶ 52; United States v. Ortiz, 362 F.3d 1274, 1275 (9th Cir. 2004). The Court must make a reasonable estimate of loss, based on the available information. See U.S.S.G. § 2B1.1 App. Note 3(C); United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007). The gain to a defendant should be used as an alternative measure of loss only where the actual or intended loss cannot be determined. U.S.S.G. § 2B1.1, App. Note 3(B).

The parties have not agreed upon a specific amount of fraud loss, except that it was $1.5 million or less. Plea ¶ 13(b). Vartanian should be held accountable for the fees paid by the victims he personally sold and brought into the Nelson Gamble "program." PSR ¶ 53. As noted above and set out in the victim list attached to the PSR, those fees totaled approximately $1.2 million. PSR ¶ 56; Campbell Decl. ¶ 8.

As described in the Declaration attached to this filing (Attachment 1), the victim list was compiled from two sources of

information: records from the third-party payment processors used by NGA/JHMK, and commission sheets seized from the company. Campbell Decl. ¶¶ 4, 8. Most victim money in the scheme was drafted from clients' personal checking accounts into escrow accounts provided by the payment processors. Id. at ¶ 3. The payment processors then distributed that money at the direction of Nelson. The total loss figure, as measured by fees actually paid by victims to NGA/JHMK, was approximately $4.2 million. Id. at ¶ 4; PSR ¶ 26.

Next, the government compiled commission sheets found at the Jackson Hunter offices. Vartanian and other salesmen at the company tracked the customers they sold and compiled periodic lists in the form of commission sheets. Campbell Decl. at ¶ 7. The commission sheets included the name of the salesman and the list of customers that salesman spoke with during a particular time period. Id. Some of these consumers cancelled out of the program before making their first payment, so not every person listed on a commission sheet actually lost money. However, matching the names in payment processor records with the names on the commission sheets results in a victim list of all Vartanian customers who actually paid fees to the company, as well as the total of such fees. Id. at ¶ 8. As shown on that victim list, Vartanian's customers paid more than $1.2 million to NGA/JHMK. Id.; PSR ¶ 32.[1] That amount excludes money paid to

---

[1] The victim list, attached as Exhibit 3 to the Campbell Declaration, is a redacted version of information previously provided to Probation

creditors, smaller fees paid to the payment processors, and money sent back to customers by the payment processors; it includes only actual fees paid, according to the payment processors. Campbell Decl. ¶ 6.

The $1.2 million figure represents actual, rather than intended, losses. Because many customers gave up on NGA/JHMK and cancelled before making all of the payments contemplated in Vartanian's client plan emails, the intended loss – i.e., all of the planned fees – would be higher. Using the documented, actual loss is a conservative approach. As Vartanian admitted, the omissions and misrepresentations he made in the sales pitch were material, and caused victims to sign up for the NGA/JHMK program. Plea ¶ 8. Victims did not know they would be making six months of payments directly to Jeremy Nelson before any money went toward paying debts, along with significant portions of their monthly payments even after that. Vartanian knew these facts, as shown by the "client plan" emails he sent following every sale. Vartanian knew exactly how many customers he sold, as he was the person doing the selling, and he knew exactly how much money the conspirators would take from each of his customers in fees, as detailed in his emails. Vartanian knew or should have known that no attorneys worked on behalf of the companies. Plea at ¶ 8. He also

---

and included with the PSR. Two consumer names that were inadvertently included on the list to Probation have been removed on Exhibit 3. Therefore, the exact total on Exhibit 3 is slightly lower than the total on the list attached to the PSR.

knew that Jackson Hunter was not, as he said, an established company with tens of thousands of clients managing billions of dollars of debt; he was working at Nelson Gamble when it suddenly became Jackson Hunter.  Plea at ¶ 8-9.  Vartanian made these misrepresentations anyway and continued to sell.[2]

A total fraud loss of approximately $1.2 million leads to a 14-level enhancement under § 2B1.1(b)(1)(H).  PSR ¶ 56.

### C. Adjustment for Number of Victims

Vartanian pitched hundreds of victims who paid fees to the scheme.  In pleading guilty, Vartanian admitted that his actions contributed to losses by more than 10 victims.  Vartanian Plea ¶ 13(c).  A 2-level enhancement under U.S.S.G. § 2B1.1(b)(2)(a), as set out in the plea agreement, is appropriate.  Plea ¶ 13(c); PSR ¶ 57.

### D. Adjustment for the Defendant's Role

As noted above, Vartanian's role was limited to sales calls. Many victims spoke to Vartanian just once.  Other defendants in the "customer service" department, such as Christopher Harati and Elias

---

[2] Moreover, the "services" provided by NGA/JHMK had little to no value.  As to most victims, the company failed to negotiate down any debts.  Some victims told the government that after quitting Nelson Gamble they simply called their credit card companies and secured reduced payments on their own.  Even if all of the victims who paid some amount to creditors as part of the NGA/JHMK program were removed from the victim list, the total fees paid by the remaining victims – those who clearly received absolutely no benefit at all – would be $780,000.  Campbell Decl. ¶ 12.  That loss figure results in the same 14-level enhancement under § 2B1.1(b)(1)(H).

Ponce, worked to keep victims in the program month after month through repeated misrepresentations in a series of lulling phone calls. Under the facts of this case, a two-level reduction under U.S.S.G. § 3B1.2(b) should apply as stipulated in the Plea Agreement. Plea ¶ 13(d); see pp. 1-2, supra.

### E. Acceptance of Responsibility

Vartanian pled guilty pursuant to a plea agreement, thereby assisting authorities in the prosecution of his own misconduct by notifying the government of his intention to enter a guilty plea. The government intends to recommend at sentencing that the Court reduce the defendant's offense level by three levels pursuant to U.S.S.G. § 3E1.1(a) and (b). This is contingent upon the defendant's continued acceptance of responsibility. PSR ¶¶ 67-68.

### F. Sentencing Guideline Range and Recommended Sentence

Taking a base offense level of 7, adding an increase of 14 levels for fraud loss and 2 levels for the number of victims, then subtracting 2 levels for a minor role and 3 levels for acceptance of responsibility, results in an adjusted offense level of 18. The advisory Sentencing Guidelines call for a sentencing range of 27 to 33 months of imprisonment in criminal history category I. Pursuant to the Plea Agreement, the United States recommends a sentence at the low end of the applicable range.

The United States agrees that Defendant's sentence also should include a term of supervised release and restitution paid to Defendant's victims in the amounts listed on the victim list. PSR ¶¶

138, 145. The total known restitution amount is $1,208,086, as shown on Exhibit 3. To the extent the names on the Vartanian victim list match names on lists related to Vartanian's co-defendants in this case, restitution should be paid jointly and severally by all three defendants. Restitution also should be paid jointly and severally by Vartanian and his co-conspirators in the related case, Christopher Harati and Athena Maldonado (Case No. 15-CR-00041-DSF), to the extent the same names appear on those lists.

A Guidelines sentence appropriately takes into account the sentencing factors set out at 18 U.S.C. § 3553. The scheme in which Vartanian participated was built upon deceiving consumers already struggling with debt into sending money to a fraudulent company rather than their creditors. Vartanian sold victims a dream of debt reduction facilitated by attorneys and other professionals, while concealing the significant fees and the true nature of the scheme for which he worked. A Guidelines sentence recognizes the nature and circumstances of Vartanian's crime as well as any mitigating factors described in the PSR. The proposed sentence also reflects the seriousness of the offense and provides adequate deterrence. It is sufficient without being greater than necessary. 18 U.S.C. § 3553.

//
//
//

## IV. CONCLUSION

For the reasons outlined above, the government respectfully requests that the Court adopt the guidelines calculation set out in the PSR, incorporate a 2-level minor role reduction as stipulated by the parties, and sentence the defendant to a term of 27 months' imprisonment.

Dated: October 31, 2016					Respectfully Submitted,

								EILEEN DECKER
								United States Attorney

								s/Alan J. Phelps
								ALAN J. PHELPS
								JAMES W. HARLOW
								Trial Attorneys
								U.S. Department of Justice
								Consumer Protection Branch
								450 Fifth St., NW, 6400-S
								Washington, DC  20001
								Telephone:  (202) 307-6154
								Facsimile:  (202) 514-8742
								Email: Alan.Phelps@usdoj.gov

								Attorney for Plaintiff
								UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I certify that on the 31st day of October, 2016, the undersigned caused a true and correct copy of the above-titled SENTENCING MEMORANDUM to be served via the District Court's Electronic Filing System upon counsel of record.

                                              s/Alan J. Phelps
                                              ALAN J. PHELPS
                                              Trial Attorney